

**Signed: November 20, 2008**

_____
**LESLIE TCHAIKOVSKY
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>RACHEL THEIN,<br>      Debtor.<br>_____/ | No. 06-41474 TT<br>Chapter 7 |
| SARA L. KISTLER, ACTING<br>UNITED STATES TRUSTEE,<br>      Plaintiff,<br>  vs.<br>RACHEL THEIN,<br>      Defendant.<br>_____/ | A.P. No. 07-4166 AT |

**MEMORANDUM OF DECISION AFTER TRIAL**

    In the above-captioned adversary proceeding, the United States Trustee (the "UST") seeks denial of the chapter 7 discharge of Rachel Thein (the "Debtor") pursuant to 11 U.S.C. § 727(a). The proceeding was tried to the Court on October 14 and 30, 2008. At the conclusion of the trial, the Court took the matter under submission. Having considered the evidence presented and the argument of the parties,

the Court now concludes that the Debtor's discharge should be denied. The reasons for the Court's decision are set forth below.

**SUMMARY OF FACTS**

The Debtor is the Chief Financial Officer and fifty percent owner of Bay Construction Company ("BayCon"), a closely held construction corporation located in the San Francisco Bay Area. The other fifty percent owner--Daryl Simmons--serves as President. Prior to 2003, the Debtor and her husband owned a home in Pleasanton, California (the "Pleasanton Home") and also a home in Montana (the "Old Montana Home"). In or about 2003, the Debtor's husband retired and moved to Montana. The Debtor continued to reside and work in the Northern California, renting a room in a relative's house located in Hayward. She visited her husband in Montana as frequently as she could.

Shortly before her husband moved to Montana, the Debtor and her husband sold the Pleasanton Home, netting approximately $782,000 from the sale. Using some of these proceeds, the Debtor and her husband purchased unimproved real property in Montana. They entered into a contract with Blueridge Homes, Inc. ("Blueridge") for the construction of a new home on the real property (the "Grey Wolf Property"). In 2004, they sold the Old Montana Home, netting approximately $80,000 from the sale.

Disputes with Blueridge arose during construction which led to litigation and ultimately to a jury trial. The jury found in favor of Blueridge. Judgment was entered against the Debtor and her

husband on or about August 11, 2006.[1]  On August 25, 2006, the Debtor filed a voluntary petition seeking relief under chapter 13 of the Bankruptcy Code.[2]  In 2006, the Debtor's husband moved back to Northern California.

On October 10, 2006, the Debtor filed her Schedules of Assets and Liabilities (the "Schedules"), Statement of Financial Affairs (the "SOFA"), and Chapter 13 plan (the "Plan"). The Schedules valued the Grey Wolf Property at $699,000.  The Plan stated that the Debtor would pay the chapter 13 trustee $296 per month and that she would sell the Grey Wolf Property within six months from confirmation or the case would be dismissed.[3]  The Plan estimated that unsecured creditors would receive approximately 87 percent of their claims.

An objection to confirmation of the Plan was filed by Blueridge on November 7, 2008.  In its objection, Blueridge contended, among other things, that: (1) the Debtor's debts exceeded the chapter 13 debt limits and (2) the Debtor had undervalued the Grey Wolf Property.  Blueridge contended that, in its opinion, the Grey Wolf

---

[1] Judgment was entered against both the Debtor and her husband for $146,800 in compensatory damages plus attorneys' fees in an amount that had not been determined at the time the Debtor's bankruptcy petition was filed.  Judgment on a defamation claim was entered solely against the Debtor's husband for $458,700, including $41,700 in punitive damages.

[2] The Debtor's husband did not join in the petition.

[3] Schedule B22C, setting forth the Debtor's current monthly income and expenses (as defined by the 2005 amendments to the Bankruptcy Code) stated that the Debtor's gross monthly income was $6,910.  Since this put the Debtor's income over the applicable median income, she completed the form, listing her expenses as approved by the Internal Revenue Service ("IRS") guidelines.  The resulting disposable income figure was a negative.

3

Property was worth $1.5 million.[4]  On November 28, 2006, an objection to confirmation was filed by Garth and Carolyn Sime (the "Simes"), who had sold the Grey Wolf Property to the Debtor and her husband and held a security interest in the property to secure the balance of the purchase price.  In their objection, the Simes also contended that the Grey Wolf Property had been undervalued in the Schedules.  They noted that on November 6, 2006, the Debtor had listed the Grey Wolf Property for sale for $1.2 million.

A confirmation hearing was conducted on January 19, 2007.  Given the unresolved disputes, the Plan could not be confirmed at that time, and the hearing was continued to February 16, 2007.  On February 7, 2007, Blueridge withdrew its objection.  An order was entered on February 21, 2007 confirming the Plan.

In April 2007, the Debtor filed a motion to sell the Grey Wolf Property free and clear of liens.  The motion stated that the sale price was insufficient to pay all the liens against the Grey Wolf Property.  The motion stated that the Debtor had entered into a contract with Barbara Campbell for the sale of the Grey Wolf Property for $1.2 million.  It proposed to pay closing costs and commission and the undisputed liens but for Blueridge's judgment lien, which it characterized as disputed, to attach to the sale proceeds.  A hearing on the motion was conducted on April 25, 2007.  Blueridge filed an

---

[4]Blueridge also objected to the Debtor's claim of a homestead exemption in the Grey Wolf Property.  On January 15, 2007, shortly before the confirmation hearing, the Debtor filed a declaration stating under penalty of perjury that until 2006 she had lived in Montana.  Based on the evidence presented at trial, this statement was clearly false.

4

opposition to the motion. On April 24, 2007, the Debtor withdrew the motion and moved to convert her case to chapter 7. The case was converted the following day.

On July 16, 2007, the UST filed a motion to extend the deadline for filing objections to October 16, 2007. This adversary proceeding was filed within the extended deadline.

## DISCUSSION

In the complaint, the UST seeks denial of the Debtor's discharge based on three separate subsections of 11 U.S.C. § 727(a): i.e., 11 U.S.C. § 727(a)(3)(failure to keep or preserve adequate books and records), 11 U.S.C. § 727(a)(4)(false oath or account), and 11 U.S.C. § 727(a)(5)(failure to satisfactorily explain loss or deficiency of assets). The UST has the burden of proof on all three claims. It must prove every element of its claim by a preponderance of the evidence. In re Scott, 172 F.3d 959, 966 (7th Cir. 1999); In re Khalil, 379 B.R. 163, 172 (Bankr. 9th Cir. 2007). The claim based on 11 U.S.C § 727(a)(4) will be discussed first.

**A. FALSE OATH OR ACCOUNT**

Section 727(a)(4) of the Bankruptcy Code provides, in pertinent part, that the Court shall grant an individual debtor a discharge unless:

> (4) the debtor knowingly and fraudulently, in or in connection with the case–
> (A) made a false oath or account...[.]

The UST's claim under 11 U.S.C. § 727(a)(4) was based primarily on the Debtor's alleged undervaluation of the Grey Wolf Property.

5

It is undisputed that, on or about August 12, 2006, the Debtor obtained Comparative Market Analysis of the Grey Wolf Property, valuing the Grey Wolf Property at $1,050,0000. Nevertheless, in the Schedules, which were filed on October 10, 2006 and were signed under penalty of perjury, she valued the Grey Wolf Property at $699,000. Then, in November 2006, the Debtor listed the Grey Wolf Property for sale at $1,200,000. In or about April 2007, she received an offer to purchase the Grey Wolf Property for this amount. The UST contends that the Debtor knowingly and fraudulently undervalued the Grey Wolf Property in the Schedules.

At trial, the Debtor attempted to explain the discrepancy between the Comparative Market Analysis obtained prior to the bankruptcy filing and the value that she placed on the Grey Wolf Property in the Schedules. She introduced into evidence two forms of a letter to her from Chase Natalie ("Natalie"), the real estate agent who performed the Comparative Market Analysis, each dated August 27, 2006.

In the first version of the letter, Natalie stated that the $1,050,000 valuation did not take into account various deficiencies in the construction or, as "described to him" that the construction was 20 percent incomplete. The second version of the letter stated that the deficiencies would reduce the value by at about $221,000 and the portion of the construction that was incomplete by about $95,000. The letter concludes with the statement that, based on these factors, the Grey Wolf Property would not sell for over $734,000 and that he

6

would be willing to list it for $699,900. The Debtor offered only the second version of the letter into evidence.

For several reasons, notwithstanding this evidence, the Court was persuaded that the Debtor's low valuation of the Grey Wolf Property in the Schedules was knowing and fraudulent. First, no evidence was presented that Natalie had inspected the Grey Wolf Property, either in performing the Comparative Market Analysis or writing the two August 27, 2006 letters. Most likely, the Debtor requested the valuation on a "what if" basis. No evidence was presented at trial that there were any deficiencies in the construction or that the construction was incomplete. To the contrary, the Montana litigation, which presumably raised contentions concerning the workmanship of the construction, was concluded in favor of Blueridge.

Second, if Natalie's opinion was that, even with these deficiencies, the Grey Wolf Property might sell for as much as $734,000, it would make no sense to list it for sale for $699,000. Normally, a listing price is higher than the intended sale price. Natalie's statement that he would be willing to list it for less than the probable sale price suggests strongly that the Debtor asked Natalie for a letter that would support her desired valuation of the Grey Wolf Property but that Natalie could not, in good faith, even assuming the described deficiencies existed, value it for as low a figure as $699,000.

Finally, and most compelling, shortly after filing the Debtor's Schedules, valuing the Grey Wolf Property at $699,000 and

7

notwithstanding Natalie's agreement to list the Grey Wolf Property for that amount, the Debtor listed the Grey Wolf Property for sale for $1,200,000. Moreover, as noted above, in or about April 2007, she received an offer to purchase the Grey Wolf Property for that amount. Although the sale did not close, its failure to close appears to have been due to the fact that the liens exceeded the sale price, not that the buyer concluded that the Grey Wolf Property was worth less than the proposed purchase price.

Based on the foregoing, the Court finds and concludes that the Debtor's valuation of the Grey Wolf Property in Schedule A of the Debtor's Schedules constituted a knowing and fraudulent false oath within the meaning of 11 U.S.C. § 727(a)(4), warranting denial of her discharge. The Court bases this conclusion both on the circumstances recited above and the Debtor's demeanor as a witness. The Court found the Debtor's testimony in general to be lacking in credibility.

There were other instances of false oaths. The Debtor listed a promissory note (the "Note") as a personal property asset, without identifying the obligor and valuing the note at zero. At trial, evidence was presented, which the Debtor did not dispute, that the obligor on the Note was BayCon, the Debtor's employer, that the Debtor received regular interest payments on the Note, and that the Debtor had received a total of $15,000 in principal payments in 2004 and 2005. The Court is persuaded that the Debtor's failure to list the obligor of the Note and her valuation of the Note at zero was knowing and fraudulent, also warranting denial of her discharge under 11 U.S.C. § 727(a)(4).

8

Finally, the Debtor also omitted from Schedule B of the Schedules, requiring all personal property assets to be listed, her 50 percent interest in BayCon. She provided no meaningful explanation for her failure to list this asset. Self-serving evidence was presented by the Debtor and Simmons that BayCon was not operating at a profit and, having few assets, had no liquidation value.

To the contrary, Crom testified that BayCon was solvent in 2006, was doing a substantial business, and had been paying the two officers substantial salaries. The Court found this evidence more persuasive than the evidence presented by the Debtor. Moreover, whether or not the interest in BayCon had a ready market value, it was clearly a substantial asset which should have been listed. Based on its observation of the Debtor's financial sophistication, based on her position at BayCon and her demeanor at trial, the Court finds and concludes that her omission of this asset was knowing and fraudulent, also warranting a denial of her discharge under 11 U.S.C. § 727(a)(4).

**B. FAILURE TO SATISFACTORILY EXPLAIN LOSS OF ASSETS**

Section 727(a)(5) of the Bankruptcy Code provides, in pertinent part that the Court shall grant an individual debtor a discharge unless:

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities...[.]

9

It is undisputed that, in 2003, the Debtor and her husband netted approximately $782,000 from the sale of the Pleasanton Home in 2003 and in 2004, netted approximately $80,000 from the sale of the Old Montana Home. It is also undisputed that the bulk of these funds were used to purchase the Grey Wolf Property and to pay Blueridge for construction costs. However, the UST contends that these do not adequately explain the disposition of the sale proceeds. In support of this claim, the UST called as an expert witness Jay Crom ("Crom"), a certified public accountant. Crom testified that he had reviewed a variety of third party documents relating to the Debtor's finances: e.g., bank statements, closing statements, tax returns, and BayCon's business records. He testified that approximately $150,000 of the real property sale proceeds was unaccounted for.

In defense of this claim, the Debtor offered into evidence a summary of the amounts received from the sales and those expended during the relevant period. According to the summary, the Debtor's costs, including the purchase of the Grey Wolf Property, exceeded the sale proceeds from both properties by January 10, 2005. Ultimately, according to the Debtor, the costs exceeded the funds received from the sale of the Pleasanton Home and the Old Montana Home by $204,201. However, as the UST pointed out, the Debtor's summary did not include the Debtor's salary as CFO of BayCon[5] nor her husband's $4,000 per

---

[5] In Schedule I, the Debtor stated under penalty of perjury that her gross salary was $1,500 per month. However, Crom stated that, according to BayCon's books and records, the Debtor had received approximately $94,000 during the fiscal year ending June 2006: i.e., approximately $7,800 per month.

10

month pension. In addition, the Debtor's summary did not include the proceeds from the sale of two vehicles: i.e., a 2003 Hummer and a 2003 Dodge truck.

Based on the foregoing, the Court finds and concludes that the UST has carried its burden of proof on its claim under 11 U.S.C. § 727(a)(5) as well and that this subsection provides an adequate alternative basis for denial of the Debtor's discharge.

**C. FAILURE TO KEEP OR PRESERVE ADEQUATE BOOKS AND RECORDS**

Section 727(a)(3) provides that the Court shall grant an individual debtor a discharge unless:

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case...[.]

The plaintiff has the initial burden of proving that the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve books and records from which her financial condition or business transactions might be ascertained. Once that burden is met, the burden of proof shifts to the debtor to prove that her action or failure to act was justified under all of the circumstances of the case. In re Cox, 41 F.3d 1294, 1296-97 (9th Cir. 1994).

At trial, the UST established that, in June 2007, it had obtained an order for a Rule 2004 examination of the Debtor, requesting production of all documents relating to the Debtor's bank accounts for the three year period preceding the bankruptcy filing.

11

The Debtor failed to produce bank statements or accounts for 2003 or 2004 showing deposits and disbursements of the proceeds from the sale of the Pleasanton Home and the Old Montana Home.

The UST established further that, in connection with the Rule 2004 examination, it requested production of all documents relating to transfers of real or personal property with a value in excess of $500 made by the Debtor or her spouse within the five year period preceding the bankruptcy filing. It established that the Debtor failed to produce any documents relating to the sale of the Pleasanton Home, the Old Montana Home, or the New Montana Home.

Finally, the UST established that it had requested production of all financial documents relating to BayCon and that the Debtor failed to produce any such documents. From the foregoing, the Court concludes that the UST met its initial burden of proving that the Debtor failed to maintain or preserve adequate books and records from which her financial condition and business transactions could be ascertained.

The Debtor's evidence that her failure to preserve books and records was justified was unpersuasive. With respect to the bank statements, she testified that, while her husband was living in Montana, she picked up her mail infrequently at a post office box and placed all financial documents in a mailing packet and mailed them to her husband without looking at them. She explained that, since she was living in a rented room, she had no space to store them. She testified that her husband, who had since moved back to California, was unable to locate the records. However, in her deposition, taken

12

in preparation for trial, the Debtor testified that she routinely shredded all of her bank statements after receiving them.

The Court did not believe either explanation. It found much of the Debtor's testimony lacking in credibility, both in substance and based on her demeanor on the stand. Thus, the Court concludes that the Debtor has failed to carry her burden of proof on this issue and that her discharge should be denied pursuant to 11 U.S.C. § 727(a)(3) as well.

**CONCLUSION**

For the reasons stated above, the Court finds in favor of the UST on all three claims for denial of the Debtor's discharge. Counsel for the UST is directed to submit a proposed form of judgment in accordance with this decision.

END OF DOCUMENT

```
                              COURT SERVICE LIST

  Margaret H. McGee
  Office of the U.S. Trustee
  1301 Clay St. #690N
  Oakland, CA 94612-5217

  Marc Voisenat
  Law Offices of Marc Voisenat
  1330 Broadway #1035
  Oakland, CA 94612
```